Samuel Iddings, Appellee, v. The Pennsylvania Railroad Company, Appellant.

Gen. No. 8, 386.

Opinion filed February 3, 1930.

C. EVERETT SMITH, for appellant.

BEVAN & BEVAN and HAROLD TRAPP, for appellee.

MR. JUSTICE SHURTLEFF delivered the opinion of the court.

Appellee, Samuel Iddings, brought his action of trespass on the case against the appellant in the Logan county circuit court, to recover damages for the loss of 6 head of steers which were killed by one of appellant's trains about 3½ miles east of Atlanta on the nights of October 9 and 10, 1928. The cause was tried upon the single issue of the alleged failure on the part of appellant to erect and maintain statutory fences upon the right of way, by reason of which the cattle of appellee strayed upon the right of way of appellant and were there killed.

The cause is presented in this court solely upon the assignment of error that the verdict is contrary to the manifest weight of the evidence. There was a verdict and judgment in the sum of $740 in favor of appellee ànd appellant has appealed. No questions as to the admission or exclusion of evidence are raised, and there are no criticisms made as to any instructions given or refused.

As to the situation and surroundings, appellant's railroad runs in a southeasterly direction from Atlanta in Logan county to Waynesville, DeWitt county, a distance of about 6 miles. About 3 miles east of Atlanta it crosses a small stream known as Clear Creek and about five-eighths of a mile further in a south-easterly direction, passes under an overhead highway bridge on a public road running north and south. Between the bridge over Clear Creek and the overhead

bridge, the tracks, for the greater part of the distance, run through a cut and upon a curve much like the letter S. Approaching Clear Creek bridge from Atlanta there is a downward grade, and, after passing the creek, a rising grade. About 12 rods east of the Clear Creek bridge there is a farm crossing, with gates in both the north and south right of way fences. The gates are ordinary slide gates, made of 16 foot lumber 1 by 6 inches in size. The right of way fence on the south side of the right of way was constructed of posts, with woven wire and barbed wire attached; much brush, briars and weeds had grown up in, through and about the fence. A short distance east of the farm crossing, a fence, running north and south and connecting with the south right of way fence, separated the field into which the farm crossing entered on the south from a field, which, at the time of the accident, was a meadow from which the hay had been harvested. The field on the south into which the farm crossing entered was, at the time of the accident, in corn, part of which had been cut and shocked, in rows running from north to south. On the north side of the right of way at the farm crossing was a small timber pasture.

Appellee, the plaintiff, a farmer and stock raiser living in Atlanta, owned a farm of at least 80 acres lying about a quarter of a mile south of the right of way of the appellant company. The east part of his land was in pasture and adjoined the corn field above referred to and was separated from it by a barbed wire fence. The east line of appellee's farm and the east line of the corn field were coincident. Clear Creek, running in a southeasterly direction after crossing under the right of way of appellant and through the cornfield, cut off about an acre and a half of the northeast corner of appellee's pasture.

On the day before the cattle were killed appellee had in his pasture 42 head of steers coming 2 years old. They were fed by him between 4 and 5 o'clock of that

day. On the following morning appellee, upon going out from Atlanta to his farm to feed his steers, found that 6 were missing. These were the 6 killed upon appellant's right of way.

The division fence between appellee's pasture and the cornfield was the portion maintained by the owner of the cornfield, and was built of posts and barbed wire. This fence, crossing Clear Creek, was broken down at or near the creek on the night the cattle were killed and all, or a major portion, of the herd of cattle passed through this fence into the cornfield immediately south of appellant's right of way. Working their way north through the cornfield for a quarter of a mile, they, or a part of them, came upon appellant's right of way.

There was testimony on the part of appellant that at about 4 o'clock in the afternoon of October 9, 1928, the farm gates on the south and north sides of the right of way were closed, and that on the next morning, before 7 o'clock, appellant's employees found a considerable portion of appellee's herd upon the right of way, 6 of which had been killed, and both gates open. One of appellant's witnesses testified that he observed cattle tracks coming into the south side of the right of way through the open south farm gate. Appellee's testimony is abstracted and in parts was as follows: "Commencing with the fence on the south side of the right of way at Clear Creek, the fence runs up even with the north end of the bridge, then it turns in and runs under the bridge. There is no fence after it goes through under the bridge. Under the bridge there were two wires at the time the cattle got in. There were two wires left there of that fence and there was a little lot of grass. I think the top wire was maybe a foot and a half high. They were barbed wires. I think at the north corner of the bridge the wires were a little higher maybe; but down at the south corner, about eight or ten feet there, it was about I suppose a foot

and a half high. That was on the east side of Clear Creek.

"There was no fence or wire across Clear Creek on the south side of the railroad. I have never seen any fence there. I made an examination of the ground as to tracks of those steers that same evening after they were appraised. Starting from the bridge over Clear Creek, under the bridge there were tracks coming up, part of them on the north side of the bridge and part on the south side, and tracks ran up here to come on top of the track, and that first steer was killed about 100 feet of the bridge. In regard to those tracks, I started at the creek where the cattle come through this field and the cattle had scattered, some one way and some another and I couldn't trace any of them very closely. The tracks were scattered so they didn't make any trail, and I searched around a while and I went over to the creek and some of them had come along the bank of the creek there. They followed a trail along the creek down until they got to this bridge, and there was a kind of path there and there is two or three willows go across it, and there is a path running over and there is stuff running over that about knee high. Then when they got in there, under the bridge, the creek and ditch there on the other side stopped them and they crossed over this fence and they went under the bridge. The tracks went up there and I noticed along the bridge here, as far as the other bridge and along up to where the first steer was, but I couldn't see any tracks coming back west. They were all going east, and the first steer was killed about 100 feet of the bridge, and that the next one a little farther on.

"The condition of those tracks showed they were fresh; I should say they had been made about 12 hours. The fence from Clear Creek up to the farm gate is a woven wire and then some barbs above it in places and in places the barb is off. As to the number of

places the barb wire was down, I noticed one place in particular about half way between the bridge and the gate. When I looked at it I saw there had been something crossing over, and I was trying to find out whether horses or cattle. I stepped over astraddle and I could touch the ground on either side. That was in the evening of that day or the next day when I went back. At that point there were tracks where something had gone over, I couldn't tell. I saw tracks there, but I don't know whether they were cattle or whether they were horse tracks. I got down and scratched in the ground to see whether they were cattle or horses; there was some large brush there and I don't know whether they were cattle or horses. There were tracks all through the cornfield, but I do not remember whether I saw any tracks within ten feet of that place.

"There was no other place between the creek and the gate that the fence was down; there was broken wire all along. At different places there was a part of the barbed wire broke and part of it was up, but I couldn't describe it from memory that far back. The wire is old and rusty. The barbed wires were broken down between the creek and the gate. I went along and looked at it, but I cannot remember about the top wire, but there was no place in the fence that it was good.

"Proceeding east from the gate toward the overhead bridge, I made an examination of the fence. I walked along it and looked at it, took hold of some of the posts to see whether they were rotten and so on. I went from the farm gate to the overhead bridge along the fence. I don't believe there was anyone with me when I went along that fence October 12th. There was once I went along there. Just east of the gate there is a place that the top wires were broken, sunken. It was about three foot high, maybe little more. That place was from five to ten rods east of the gate. The

next really bad place was where the fence was laying down for about four rod. This place was about 20 rods from the farm gate. There, the fence was laying flat on the ground. The ground it lay on was flat. The grade didn't come down to the fence there. There was room between the grade and the fence. The fence was laying right on the ground and it was laying flat. The fence was three or four feet from the grade. I counted them, I think it was three rods it was down there. In making that examination, I was walking on the corn-field side of the fence. The right of way was grown up in briars and things and wasn't nice walking. Continuing toward the overhead bridge, there was a place a little further up, the fence was laying down and there were several places it was leaning. Then there was one place that the woven wire was cut clear out or broken out and the top wire was on the post yet, and cattle could walk right under that and go in.''

Appellee was strongly corroborated as to the condition of the fence and of the cattle killed. Two were found west of the farm gate and between the gate and the bridge over Clear Creek and four were found lying east of the farm gate and between it and the overhead bridge. One witness testified, who saw the cattle and observed the cattle tracks on the right of way that it would appear that the cattle were running from west to east and that the cattle tracks started west of the farm gate. It is not shown how the farm gates came to be open. As to the maintenance of the farm gates, appellant states the rule correctly: ''A railroad company is not required to patrol the line of its road to see if gates at farm crossings are left open. Nor to keep a guard upon the road sufficient to discover and counteract such carelessness immediately upon its occasion. The company is only negligent where it has had reasonable time to discover such breach or has been notified and failed to take proper action.'' And in this

case, from the proofs submitted, if the jury believed
from a preponderance of the evidence, that the cattle
passed upon appellant's right of way, through the farm
gate, there should have been a verdict for appellant,
unless negligence was shown on the part of appellant.
It is provided in section 1 of Cahill's St. ch. 114, ¶ 78:
"That every railroad corporation shall, within six
months after any part of its line is open for use, erect
and thereafter maintain fences on both sides of its
road or so much thereof as is open for use, suitable and
sufficient to prevent cattle, horses, sheep, hogs or other
stock from getting on such railroad, . . . and when
such fences or cattle-guards are not made as aforesaid,
or when such fences or cattle-guards are not kept in
good repair, such railroad corporations shall be liable
for all damages which may be done by the agents,
engines or cars of such corporation, to such cattle,
horses, sheep, hogs, or other stock thereon, and reason-
able attorney's fees, in any court wherein suit is
brought for such damages, or to which the same may
be appealed; but where such fences and guards have
been duly made and kept in good repair, such railroad
corporation shall not be liable for any such damages,
unless negligently or wilfully done." And this is the
law regardless of how the cattle came to be upon the
premises from which they passed through the insuffi-
cient fence to the right of way. (*Chicago & N. W. Ry.
Co. v. Harris,* 54 Ill. 528, 531; *Cairo & St. Louis R.
Co. v. Murray,* 82 Ill. 76, and *Ewing v. Chicago & Alton
R. Co.,* 72 Ill. 25.)

The jury in this cause could have found a verdict
for either party and the verdict would have been sup-
ported by the proofs. The verdict is not manifestly
against the weight of the evidence and the judgment
of the circuit court of Logan county should be and
is affirmed.

*Affirmed.*